## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| | : | |
| | : | CIVIL ACTION NO. |
| QUEEN M. ALLEN, et al., | : | 3:12-CV-00482 (JCH) |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| VERIZON WIRELESS, et al., | : | |
| Respondent. | : | JUNE 23, 2015 |

**RULING RE: MOTIONS FOR SUMMARY JUDGMENT (Docs. No. 207, 212)**

Plaintiffs Queen Allen ("Allen") and Waltrina Whitman ("Whitman") bring this action against Allen's former employer, defendant Verizon Wireless ("Verizon"), and Verizon's employee benefits plan administrator, MetLife Insurance Co. ("MetLife"). Allen claims that Verizon violated her rights under the Americans with Disabilities Act (ADA), the Family Medical Leave Act (FMLA), and the Employee Retirement Income Security Act (ERISA), and that MetLife wrongfully denied her benefits in violation of ERISA.   Sixth Amended Complaint ("Sixth Amd. Compl.") (Doc. No. 133).   Allen and Whitman both also bring state law claims against both defendants.   Id.   Both Verizon and MetLife have moved for summary judgment as to all claims against them.   Motion for Summary Judgment by Verizon Wireless (Doc. No. 207) ("Verizon's Mot."); Motion for Summary Judgment by MetLife (Doc. No. 212) ("MetLife's Mot.").

For the reasons that follow, Verizon's Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part.   MetLife's Motion for Summary Judgment is **GRANTED**.

I.    **FACTS**[1]

Allen was employed by Verizon in its Wallingford call center from 2004 through

January 14, 2011.   Plaintiffs' Local Rule 56(a)(2) Statement (Doc.No. 229-1) ("Pl.'s

Loc. R. 56(a)(2) Stmt. Re: Verizon") ¶ 7.   From 2005 until her termination on January

14, 2011, Allen was a Business Support Coordinator, with responsibilities that included

fielding incoming calls, assisting customers, meeting quotas for average calls per day,

and ensuring customer needs were met.   Id. ¶¶ 8-10.

MetLife administers Verizon's employee FMLA and Short-Term Disability ("STD")

benefits, as set forth in an Administrative Services Agreement ("ASA").   Id. ¶¶ 1-2.

Pursuant to this Agreement, MetLife handles all of the documentation collection, FMLA

and ERISA notices, and decision-making with respect to FMLA or STD requests made

by Verizon employees.   Id. ¶ 3.   During the course of her employment with Verizon,

Allen applied for leave under the FMLA and for STD benefits on multiple occasions.

One such request was made in September 2009, when Allen took time off from

work due to her anxiety and depression, and she requested both FMLA and STD.

MetLife initially denied both requests.   Id. ¶ 21.   On appeal, MetLife granted Allen's

STD benefits.   In February 2010, Allen requested and was granted FMLA leave in

order to care for her mother, plaintiff Whitman.   Id. ¶¶ 31-32.   In doing so, Allen

submitted a FMLA Healthcare Provider Certification ("HCPC") completed by Whitman's

APRN, Linda Spiegel.   Id. ¶ 31.   In February/March 2010, Allen applied for FMLA and

STD related to her own medical conditions.   Id. ¶ 33.   MetLife faxed a form to

Whitman's APRN, Nurse Spiegel to complete in connection with Allen's STD claim,

---

[1] Unless stated otherwise, the following facts are not in dispute.

although Nurse Spiegel did not treat Allen.   Plaintiffs' Local Rule 56(a)(2) Statement (Doc.No. 229-4) ("Pl.'s Loc. R. 56(a)(2) Stmt. Re: MetLife") ¶ 32.   Both Allen's FMLA and STD claims were denied.   Id. 36.   Allen appealed the STD denial, and MetLife reversed its denial on appeal.   Id. 38.

On November 15, 2010, Allen submitted a FMLA claim to MetLife in connection with her own medical conditions.   Pl.'s Loc. R. 56(a)(2) Stmt. Re: Verizon ¶39.   On November 16, 2010, MetLife sent Allen a letter asking her to complete and return an enclosed HCPC form, and notifying her that failure to return the form by the deadline could result in FMLA denial.   On the same day, MetLife also sent another communication notifying Allen of her FMLA rights and obligations and notifying her that she had 15 calendar days to return the HCPC form or face denial of her request, and that denial could impact her employment status.   Id. ¶ 42.   On November 23, 2010, Allen applied for STD benefits, and MetLife sent her an email that stated "if you have not already done so, please complete the medical authorization form and fax/mail back to MetLife and give a copy to your physician."   Id. ¶ 44, Verizon's Loc. R. 56(a)(1) Stmt. Exh.A-18 (Doc. No. 209-1 at 77).   MetLife also informed Allen that, if her FMLA request was denied, she must return to work immediately or face potential termination.   Id. ¶ 46.

On December 6, 2010, MetLife notified Allen that her FMLA request had been denied for failure to submit the requested medical documentation, and instructed her to contact Verizon to determine her job status or other leave options.   Id. ¶¶ 48-49.   On December 13, MetLife denied Allen's STD claim.   Id. ¶ 50.   The stated reason for

denial was failure to receive the requested medical information regarding Allen's claim. Verizon's Loc. R. 56(a)(1) Stmt. Exh.A-22 (Doc. No. 209-1 at 95).

On December 20, 2010, after receiving notification that Allen's FMLA request had been denied, Verizon Unplanned Leave Team member Diane Anderson ("Anderson") sent Allen a letter informing her that, if she needed additional time out of work, it was extremely important to contact her.   She also sent Allen "Workplace Arrangement Request and Medical Release" forms and informed Allen that they needed to be returned by December 27, 2010.   She further notified Allen that failure to return to work and/or provide medical information by December 27, 2010, would result in an Unauthorized Leave of Absence designation, which could lead to a termination for job abandonment.   Id. ¶ 54, 56.   Anderson also left Allen a voicemail regarding the contents of the letter.   Id. ¶ 57.

On January 3, 2011, Anderson sent a second letter to Allen informing her that Verizon had not received the requested information, and that because Allen had not returned to work, Verizon would be placing her on an Unauthorized Leave of Absence and thus subjecting her to termination for job abandonment.   Id. ¶ 59.   The letter stated, "if you do not return to work by Monday, January 10, 2011, with documentation in hand, the company will conclude that you have elected to abandon your position." Id. ¶ 61, Verizon's Loc. R. 56(a)(1) Stmt. Exh. A-26 (Doc. No. 209-2 at 93).   Anderson also called Allen and left another voicemail.   Pl.'s Loc. R. 56(a)(2) Stmt. Re: Verizon ¶

62.   On January 6, 2011, Anderson again called Allen, and explained the process as laid out in the letters.   Id. ¶ 64.[2]

During the period in which Allen submitted her claims, she was also in communication with her supervisor, Deb Bushman, regarding her absences.   Bushman informed her several times that she needed to be in touch with MetLife, including on December 30, 2010, when she stated "please make sure you have contacted MetLife and are up to date with them as we do not have any approval at this time."   Id. ¶ 66, Loc. R. 56(a)(1) Stmt. Exh.A-24 (Doc. No. 209-2) at 71.   On January 2, 2011, Bushman spoke to Allen and informed her that she needed to respond to Anderson's letters, and Allen conceded she had not contacted MetLife.   Id. ¶ 67.   Bushman left Allen another voicemail on January 4, 2011.   Id. ¶ 68.   On January 4, Allen filed an appeal of her STD denial.   Id. ¶ 76.   MetLife acknowledged receipt of the appeal on January 14, 2011.   Id. ¶ 78.   On the same day, Verizon terminated Allen for job abandonment.

Allen's appeal letter, dated January 5, 2011, stated that, "I am currently under the care of medical professionals for my symptoms."   Pl.'s Loc. R. 56(a)(2) Stmt. Re: MetLife ¶ 54.   Upon receipt, her claim file was reviewed by Appeal Specialist Karen A. Rotundo.   Id. ¶ 57.   After unsuccessfully trying to contact Allen on the phone, id. ¶ 60,[3] Rotundo sent Allen a letter on January 14, 2011, "recommending that you, and your

---

[2] In her Local Rule 56(a)(2) statement regarding this paragraph, Allen states that this is "disputed to the extent that Allen submitted an appeal to MetLife regarding her absences as requested by her Superior Deb Bushman."   In the court's view, this does not dispute the fact that Allen spoke with Anderson on January 6, 2011, and that Anderson explained the process described in the letters to her, which is clearly supported by the record.   Verizon's Loc. R. 56(a)(1) Stmt. Exh. A, Allen's Deposition Testimony (Doc. No. 209-1) at Tr. 122:21-123:24.

treating provider's [sic], submit clinical information in the form of detailed notes, treatment information, etc. . . . Please contact your provider and provide any additional medical information within ten days of your receipt of this letter."   Id. ¶ 61, Declaration of Stephanie Williams, Exh. A (Doc. No. 212) ("Admin. Rec.") at 474.   Rotundo also sent a request for updated medical records to Dr. Karl.   Pl.'s Loc. R. 56(a)(2) Stmt. Re: MetLife ¶ 63.   On February 3, 2011, Dr. Karl responded that he was a periodontist and had only done one examination on Allen, and thus believed he had received the request in error.   Id. ¶ 65.   On January 26 and February 3, 2011, Rotundo attempted unsuccessfully to contact Allen via telephone.   Id. ¶ 66.   On February 8, 2011, Rotundo stated that, because MetLife still hadn't received any medical evidence to support Allen's STD claim, it would extend her time to submit such evidence.   Id. ¶ 67. In a letter dated February 9, 2011, Rotundo informed Allen that MetLife would require an additional 45 days to render its appeal decision.   Id. ¶ 68.   On February 22, 2011, MetLife Appeal Specialist Les R. Hausfield contacted Allen and left a voicemail informing her that MetLife still had no medical documentation on file, and recommending that she have healthcare providers provide MetLife with the requested information.   Id. ¶ 71.   On February 28, 2011, Allen contacted MetLife and stated that she was in the process of obtaining her medical information.   Id. ¶ 71.

On the same day, MetLife received Allen's medical records from periodontist Dr.

---

[3] Allen states that she "can neither affirm or deny" that Rotundo attempted to contact her but her message went straight to voicemail, thus the court deems this statement admitted.   See Johnson v. Connecticut Dep't of Admin. Servs., 972 F. Supp. 2d 223, 229 (D. Conn. 2013) ("where the Plaintiff has neither admitted nor denied a fact and where the record supports such fact, those facts are deemed to be admitted.") aff'd, 588 Fed. App'x 71 (2d Cir. 2015).

Karl's office.   Id. ¶ 73.   The records described visits on November 16, November 23, and December 2, 2010, related to Allen's complaints of tooth soreness.   Id. ¶ 74.   On the last visit, Dr. Karl advised that he had exhausted all dental treatment options and referred Allen to Dr. Saidon, an endodontist.   Id. ¶ 76.   Dr. Karl's office visit notes were reviewed by MetLife Nurse Consultant Carrie L. Christina, who noted that the medical records did not support a functional impairment beyond November 15, 2010.   Id. ¶ 78.

On March 10, 2011, MetLife received an endodontic case report from Dr. Saidon.   Id. ¶ 79.   The report noted Allen's complaints of longstanding bilateral pain and swelling in her mouth.   Id. ¶ 80.   It stated that Allen did not show any sensitivity to heat, cold, or chewing, that all posterior tests were normal, and that Allen had some discomfort when tooth #18 was probed.   Id. ¶ 81.   Dr. Saidon concluded that "the source of her pain is most likely the parotid glands (partial blockage?), and my recommendation would be to refer Queen to an oral surgeon for further evaluation." Id. ¶ 82.   During a telephone call with Ms. Rotundo, Allen informed her that she had had one visit with an oral surgeon in December, but that he only prescribed antibiotics and referred her back to her dentist.   Id. ¶ 86.

By fax dated March 15, 2011, Allen submitted a Connecticut Department of Labor Physicians Certification of Claimant's Health form, which was later clarified to be from Nurse Susan Hope, APRN.   Id. ¶¶ 89, 95.   The form stated that the nature of Allen's illness was depression and anxiety, and that Allen's job at Verizon aggravated her medical condition and was not a good match for her.   Id. ¶¶ 91-92.   It further stated that Allen's medical condition did not require her to stop working, but noted that her symptoms made it difficult for her to be as consistent with attendance as she

needed to be.   Id. ¶ 93.[4]   Allen also submitted an undated referral slip indicating that she was referred to an orthodontist regarding issues with her retainer.   Id. ¶ 94.

Rotundo referred Allen's medical records to Nurse Consultant Rosanne E. Lombardi for review. Id. ¶ 97.   Nurse Lombardi determined that Allen's claimed functional impairment lacked medical support.   Id. ¶ 98.   Due to this determination, she recommended that Allen's medical records be referred for review to two independent physician consultants ("IPC") board certified in psychiatry and dentistry. Id. ¶ 99.   She recommended that the questions posed to the IPCs pertain to Allen's functional abilities for the period in review, restrictions and limitations, and any side effects caused by her medications.   Id. ¶ 100.   Based on this recommendation, MetLife referred Allen's file to IPC vendor MLS Group of Companies ("MLS") on March 28, 2011.   Id. ¶ 101.

MLS retained Dr. Gregory S. Thomas, D.D.S., M.S., board certified in oral and maxillofacial surgery, to review Allen's medical records and issue a report.   Id. ¶ 102. In his report, Dr. Thomas listed Nurse Spiegel's FMLA Certificate, which contained Whitman's, not Allen's, medical information, as among the information he reviewed. Id. ¶ 103.   Dr. Thomas's report included a detailed discussion of the medical records associated with Allen's mouth pain, as well as his attempts to speak with her health

---

[4] Allen denies that Nurse Hope's form "confirmed that Allen's medical condition did not require her to stop working." Pl.'s Loc. R. 56(a)(2) Stmt. Re: MetLife ¶ 93.   She cites no evidence in support of this denial.   The form cited by MetLife contains the following question: "In your professional opinion, was it necessary for the individual to leave his/her position for health reasons?" The answer "no" is checked. See Johnson, 972 F. Supp. 2d at 229 (D. Conn. 2013) ("Where the Plaintiff has objected to Defendant's facts but has failed to support her objection with any admissible evidence in the record, where the record itself does not support Plaintiff's denials . . . those facts are deemed to be admitted.") aff'd, 588 Fed. App'x 71 (2d Cir. 2015).

care providers.   Id. ¶ 105.   Following the review of Allen's medical records and his

discussion with Dr. Karl's representative, Dr. Thomas opined that Allen's records

contained "no documentation for functional limitations from either the perspective of

general dentist or the endodontist" and that she was "not functionally impaired" between

November 15, 2010 and January 14, 2011.   Id. ¶ 109.

Rotundo also referred Allen's records to IPC vendor Professional Disability

Associates ("PDA") on March 28, 2011.   Id. ¶ 111.   PDA retained Dr. Sharon Packer,

a board certified psychiatrist, to review Allen's records and provide an opinion as to

whether she had an impaired work capacity from a psychiatric perspective.   Id. ¶ 112.

Like Dr. Thomas, Dr. Packer also included Whitman's certification as among the

information she reviewed.   Id. ¶ 113.   Dr. Packer's report noted that in response to her

own message, she received a voicemail from APRN Hope stating that she only treated

Allen for medication management, that Allen was not in therapy, and that she did not

"see her as often as I need to get a good sense of her."   Id. ¶ 116.   APRN Hope

further stated that she did not know at what level Allen could work again.   Id. ¶ 117.

Dr. Packer's report also contained a detailed discussion and analysis of Allen's medical

records in which she described the medical record from APRN Spiegel, which was

actually Whitman's, as being inconsistent with APRN Hope's updated medical records,

because the record from APRN Spiegel demonstrated a more significant psychiatric

issue than Allen's other records.   Id. ¶ 118.   Dr. Packer also opined that Allen's

pre-existing psychiatric condition was not the main reason she left work, and that there

was no documentation that her psychiatric condition significantly worsened during this

time.   Id. ¶ 119.   She found it notable that APRN Hope had admitted that Allen's

current psychiatric treatment was insufficient to support a disability.   Id. ¶ 120.   She

further opined that there was insufficient documentation to demonstrate that psychiatric

problems prevented Allen from working form November 15, 2010 through January 14,

2011.   Id. ¶ 121.

After reviewing the IPC's reports, on April 12, 2011, Rotundo upheld MetLife's

initial adverse benefit determination on appeal.   Id. ¶ 124.   Rotundo sent a letter to

Allen informing her of this decision.   Id. ¶ 125.   The letter listed all of MetLife's

attempts to have her provide medical support for her claimed functional impairments.

Id. ¶ 126.   It also informed her that MetLife had referred her medical records to the two

IPC board certified specialists, and of their opinions that there was insufficient

documentation supporting her claimed functional impairments.   Id. ¶¶ 127, 128.

Rotundo concluded by informing Allen that in order to receive STD benefits, the Plan

> "requires . . . objective medical evidence that an employee cannot perform
> the essential functions of his or her job because of a medical condition . . .
> Based on the information available along with the physician consultant
> reviews, we were unable to conclude that you were unable to perform the
> essential functions of your job . . . for the period November 15, 2010 to
> January 14, 2011. The information available noted you received
> treatment, however lacked the objective evidence sufficient to document a
> condition or symptoms that were of a level of severity that would be
> consistent with functional impairment and an inability to perform your job.
> While we recognize that you may have had some difficulty, the file lacked
> the objective evidence to conclude that you were prevented from
> performing the essential functions of your job.

> Id. ¶ 129.

Pursuant to Allen's request, on June 14, 2011, MetLife sent Allen a copy of her STD

claim file.   Id. ¶¶ 131, 132.

## II.     STANDARD OF REVIEW

A motion for summary judgment is properly granted only if "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." O'Hara v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, 642 F.3d 110, 116 (2d Cir. 2011). Thus, the role of the district court in deciding a summary judgment motion "is to determine whether genuine issues of material fact exist for trial, not to make findings of fact."   Id.   In making this determination, the court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. See Garcia v. Hartford Police Dep't, 706 F.3d 120, 127 (2d Cir. 2013).

"The moving party bears the burden of establishing the absence of any genuine issue of material fact."   Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010).   Once the moving party has satisfied that burden, to defeat the motion "the party opposing summary judgment . . . must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'"   Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)).   "For summary judgment purposes, a 'genuine issue' exists where the evidence is such that a reasonable jury could decide in the non-moving party's favor."   Cambridge Realty Co., LLC v. St. Paul Fire & Marine Ins. Co., 421 F. App'x 52, 53 (2d Cir. 2011); see also Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 104 (2d Cir. 2011) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)) (stating that the non-moving party must point to more than a mere "scintilla" of evidence in its favor). "[U]nsupported allegations do not create a material issue of fact."   Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000).

### III.    PENDING MOTIONS

Before addressing the merits of the pending motions for summary judgment, the court must address several issues related to the record before it.

### A.    Evidentiary Objections

In connection with her Opposition, Allen filed a document entitled "Evidentiary Objection Opposing Summary Judgment" (Doc. No. 229-6).   In large part, this document appears to simply disagree with evidence presented by Verizon or MetLife, for example, statements made in sworn affidavits.   Such "objections" are essentially argument, and more appropriately presented in Allen's Opposition.   However, Allen also appears to challenge the admissibility of the "Declaration of Stephanie Williams," to which the Administrative Record is attached, as not based on the affiant's personal knowledge.   Given Allen's pro se status, the court will construe this portion of Allen's submission as an objection to the admissibility of the declaration.

Ms. Williams' Declaration provides a description of the general policies and practices of MetLife with regard to STD benefits claims and FMLA leave requests.   It also attests that the attached "Exhibit A" is a true and correct copy of MetLife's administrative file regarding Allen's claims, and contains several statements about the content of those records.   Ms. Williams' Declaration provides that she has been employed with MetLife since approximately 2008.   During the time relevant to Allen's Complaint, she was employed as a Case Manager, during which time she processed FMLA leave requests and STD benefits.   Williams is currently employed by MetLife as a Unit Leader, and prior to that was a Claims Support Specialist for approximately three years.   The Declaration further provides that Williams' Affidavit is based on her own

personal knowledge.   The court is thus satisfied that Ms. Williams is competent to testify on these matters.   Further, the court is satisfied that Williams is an appropriate party to authenticate these records.   Thus, Allen's objection is overruled.

Allen filed an additional document entitled "Evidentiary Objections" (Doc. No. 269) in connection with Verizon's supplemental Memorandum and Reply.   In this document, Allen objects to the admissibility of the Affidavit of Audrey Cinanni Eller in full.   For similar reasons as set forth for Ms. Williams, Allen's objection is overruled. Eller is employed by Verizon as a Consultant in its Employee Phone Discount Program Department.   The substance of her affidavit concerns the substance and practices of Verizon's discounted phone program, as well as Allen's participation in the program. The affidavit further provides that Eller's Affidavit is based on her own personal knowledge.   The court is thus satisfied that the affidavit is based on personal knowledge, sets out facts that would be admissible in evidence, and that Eller is competent to testify on the matters stated.

B.   Motions for leave to file Sur-Replies

Both Allen and Whitman have submitted Motions for Leave to File sur-replies in response to the replies filed by Verizon and MetLife, Doc. Nos. 247 and 249, as well as joint Motions for Leave to File responses regarding defendants' responses to their Local Rule 56(a)(2) Statements, Doc. Nos. 244 and 245.   As discussed at oral argument on March 24, 2015, the court views these as primarily reiterating the arguments made by plaintiffs in their Oppositions.   To the extent that the sur-replies raise any new issues, in particular Whitman's sur-reply to MetLife's motion, the defendants have already had the opportunity to address them either at oral argument or by way of a Motion in

Opposition to the plaintiffs' Motion for Leave to File.   Thus, in light of plaintiffs' pro se status, the court grants Allen and Whitman's Motions for Leave to File.

    C.    <u>Motion to Strike</u>

Allen also filed a Motion to Strike (Doc. No. 268) portions of Verizon's Reply Brief in Response to Allen's Response to Verizon's Supplemental Memorandum of Law (Doc. No. 267).   Allen objects to certain statements as "mischaracterizing the Plaintiff Allen."   Motion to Strike at 2.   Again, Allen's objection is essentially that she disagrees with arguments made by Verizon.   She has provided no legal basis for striking these statements, nor can the court discern any.   Thus, the Motion to Strike (Doc. No. 268) is denied.

## IV.    DISCUSSION

    A.    <u>Verizon Wireless's Motion for Summary Judgment: Federal Claims</u>

        1.    ADA Discrimination

Allen alleges that Verizon discriminated against her because of her disability, in violation of the ADA, when they terminated her employment on January 14, 2011.[5]   In order to state a <u>prima facie</u> case of disability discrimination under the ADA, Allen must show that "(1) [her] employer is subject to the ADA; (2) [she] was disabled within the meaning of the ADA; (3) [she] was otherwise qualified to perform the essential functions of [her] job, with or without reasonable accommodation; and (4) [she] suffered adverse

---

[5] The court previously considered and dismissed Allen's claims of wrongful discharge and creating a hostile work environment in violation of the ADA.   Ruling re: Motions to Dismiss, June 6, 2013 (Doc. No. 131) ("MTD Ruling") at 34–37.   In the same Ruling, the court noted that Allen also appeared to state a claim for failure to accommodate her in 2009.   <u>Id.</u> at 39 n.16.   Verizon had not moved to dismiss this claim and so the court did not address it, <u>id.</u>, and Verizon did not brief this claim in their Motion for Summary Judgment.

    At oral argument, Allen confirmed that she was not bringing a claim for failure to accommodate.

employment action because of [her] disability."   McMillan v. City of New York, 711 F.3d 120, 125 (2d Cir. 2013) (internal quotation marks omitted).   Claims alleging disability discrimination in violation of the ADA are subject to the McDonnell Douglas burden-shifting analysis.   McBride v. BIC Consumer Prods. Mfg. Co., 583 F.3d 92, 96 (2d Cir. 2009).   Once a plaintiff has established a prima facie case, the employer "must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the discharge; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext."   Id. (internal quotation and citation omitted).

Verizon argues that, even if Allen was disabled within the meaning of the ADA (which they contest), Allen has not shown that she was qualified to perform the essential functions of her job as a customer service phone representative, as there is no evidence that she could have returned to work as of her termination date.   Verizon Wireless' Reply to Queen Allen in Further Support of its Motion for Summary Judgment (Doc. No. 234) ("Verizon Rep." at 4).   Allen bears the burden of production and persuasion as to whether she can perform the essential functions of the job, with or without reasonable accommodation.   Desmond v. Yale-New Haven Hosp., Inc., 738 F. Supp. 2d 331, 343 (D. Conn. 2010) (citing Borkowski v. Valley Cent. School Dist., 63 F.3d 131, 137-38 (2d Cir. 1995).

It is uncontested that Allen did not seek an accommodation, nor did she return to work prior to her termination.   Loc. R. 56(a)(2) Stmt. ¶ 72.   Courts in this Circuit have "consistently ruled that an employee cannot be considered otherwise qualified when she is unable to report to work at the time required" and that a plaintiff's "persistent

absence from work, alone, precludes him from being considered qualified under the ADA." Lewis v. New York City Police Dep't, 908 F. Supp. 2d 313, 327 (E.D.N.Y. 2012) aff'd sub nom. Lewis v. NYC Police Dep't, 537 F. App'x 11 (2d Cir. 2013) (internal citations and quotations omitted) (collecting cases). Further, while Allen took steps to report her absences, she was on notice that her absences were not excused, and she did not provide Verizon with any medical documentation during that time. Loc. R. 56(a)(2) Stmt. ¶ 73.

However, even assuming that a jury could reasonably find Allen was qualified for her position despite her nearly two-month absence, and that Allen can otherwise establish her prima facie case of discrimination, there is no evidence to support a finding that Verizon's stated non-discriminatory reason for her termination – namely, that she had abandoned her job – is a pretext for a discriminatory purpose related to her disability. It is not contested that, at the time of her termination, Allen had been absent from work without approved leave since November 15, 2010. Allen claims that Bushman told her she could no longer communicate her absences by email, and that her condition made it difficult for her to speak on the phone, thus preventing her from reporting her absences. Allen's Memorandum of Law in Support of its Opposition of Verizon Wireless Summary Judgment (Doc. No. 229) ("Allen's Opp. re: Verizon") at 30, 34. However, the record indicates that Allen reported by email at least until the end of December. ¶ 66, Loc. R. 56(a)(1) Stmt. Exh.A-24 (Doc. No. 209-2) at 72. Further, even assuming as true that after this date Allen was not permitted to report her absences via email, a failure to report her absences does not appear to have been the basis for Allen's termination. Rather, the record indicates that Allen was terminated

because she neither provided medical documentation to substantiate her absences nor returned to work after her FMLA claim was denied.

Allen also argues that both Bushman and Anderson were aware of her disability when she was terminated.   Allen's Opp. re: Verizon at 35.   Even if true, this alone would not be sufficient to establish pretext.   See Khan v. Bank of America, N.A., 372 (F. Appx. 216, 218 (2d Cir. 2010) (summary order).   Prior to Allen's termination, both Anderson and Bushman reached out to her multiple times advising that she needed to submit documentation to substantiate her absences or return to work, and that her absences were not approved.   In her letter dated December 20, 2010, Anderson stated that, "[i]f you wish for the Company to consider further time off as a reasonable arrangement, it is your responsibility to work with your physician to ensure that Verizon Wireless is given the information needed to make a decision on your request."   Loc. R. 56(a)(1) Stmt. Exh.A-2 (Doc. No. 209-1) at 66.   She also informed Allen that, if she had not returned to work nor provided documentation, or otherwise contacted her, by December 27, 2010, she would be placed on an Unauthorized Leave of Absence, meaning she would be subject to termination.   Id.   Allen did not contact Anderson, return to work, or provide the requested documentation by that date.

Thus, even resolving all disputed facts and drawing all inferences in Allen's favor, there is nothing in the record from which a reasonable factfinder could conclude that Verizon's stated reason for termination was pretext for discrimination based on her disability.   Thus, Verizon's Motion for Summary Judgment is granted as to Allen's ADA claim.

2.      FMLA Interference

Allen next alleges claims against Verizon for interference under the FMLA.   "The FMLA entitles eligible employees to 'twelve workweeks per year of unpaid leave, because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.'"   Ridgeway v. Royal Bank of Scotland Group, 2012 WL 1033532 at *5 (D. Conn. 2012) (quoting Sista v. CDC Ixis North America, Inc., 445 F.3d 161, 174 (2d Cir. 2006)).   In order to state a prima facie case of FMLA interference, Allen must show that (1) she is an eligible employee under the FMLA; (2) Verizon is an employer as defined in the FMLA; (3) that she was entitled to leave under the FMLA; (4) that she gave notice to Verizon of her intention to take leave; and (5) that she was denied benefits to which she was entitled under the FMLA.   Id. at *6.   Allen claims that Verizon interfered with the exercise of her rights under the FMLA when her November 2010 request was denied, and when her February/March 2010 request based on her own condition was denied.   She also claims FLMA interference based on the disclosure of confidential medical information obtained during the FMLA process.

a.      Claim Based on November 2010 Request

Verizon argues that Allen's FMLA interference claim based on her November 2010 request fails because she was not an eligible employee at the time she submitted her FMLA request in November 2010.   Verizon Mem. at 28.   In order to qualify as an "eligible employee" under the FMLA, Allen must have been employed for at least 1,250 hours of service with the employer during the previous 12-month period.   29 U.S.C. § 2611(2)(ii).   As of November 15, 2010, Allen had worked 1,061 hours during the

previous 12-month period.   Verizon Loc. R. 56(a)(1) Stmt. ¶ 51.[6]   In support of her

eligibility, Allen points to the letter she received from MetLife on November 16, 2010,

which stated that, "[b]ased on your eligibility status at the time you submitted your leave

request, you meet the eligibility requirements under the Family and Medical Leave Act

(FMLA), state family and medical leave laws and/or your employer's family and medical

leave program."   Pl.'s Loc. R. 56(a)(2) Stmt. ¶ 51; MetLife Declaration of Stephanie

Williams ("Williams Decl.") (Doc. No. 221) Exh. A at 505.   While not a model of clarity,

the court agrees with Verizon that this letter does not state that Allen was eligible under

FMLA specifically; rather, it indicates that MetLife determined that Allen was eligible

under either FMLA, state laws, or the employer's program.

Although Verizon did not specifically notify Allen that she was ineligible at the

time she filed for FMLA, there is no evidence in the record to place in dispute the fact

that Allen worked only 1,061 hours in the 12 months preceding her November 2010

FMLA claim.   In light of the clear statutory language and the lack of any evidence in the

record to suggest that Allen was employed with Verizon for at least 1,250 hours in the

12-month period preceding her November 2010 claim, Allen cannot show that she was

an eligible employee as required to make out a prima facie case of FMLA interference.

Thus, summary judgment is granted for Verizon with regards to Allen's FMLA

interference claim based on the November 2010 claim.

---

[6] Allen denies this statement in her Rule 56(a)(2) Statement; however, the evidence cited in support of her response does not refute that this number accurately represents the number of hours worked by Allen from November 15, 2009 through November 15, 2010. See Pl.'s Loc. R. 56(a)(2) Stmt. ¶ 51.

b.      Claim based on February/March 2010 Request

Verizon also seeks summary judgment on Allen's claims based on the denial of her February/March 2010 FMLA request based on her own medical condition.[7] Verizon argues that Allen's claim must fail for three reasons: first, because Allen did not submit the required medical certificate within 15 days; second, because Verizon itself took no action in connection with Allen's FMLA request; and third, because Allen suffered no tangible injury as a result of the alleged interference.

Under the FMLA, an employer may "require that a request for leave . . . be supported by a certification issued by the health care provider of the eligible employee." 29 U.S.C. § 2613(a).   Where an employee requests leave because of a serious health condition that makes the employee unable to perform the functions of his or her position, the certification "shall be sufficient" if it states (1) the date on which the serious health condition commenced; (2) the probable duration of the condition; (3) the appropriate medical facts within the knowledge of the health care provider regarding the condition; and (4) a statement that the employee is unable to perform the functions of his or her position.   29 U.S.C. § 2613(b).   In the case of unforeseeable leave, if an employee fails to provide certification within 15 days, an employer "can deny FMLA

_____

[7] In its June 6, 2013 Ruling, the court concluded that Allen had also plausibly stated a claim for FMLA interference based on the denial of her September 2009 FMLA request, the denial of her February/March 2010 FMLA request, and the disclosure of confidential information that was obtained during the FMLA process.   MTD Ruling at 40-42.   At oral argument, Allen confirmed that she did not intend to bring a claim based on the Fall 2009 denial.   However, she stated that she intended to press the other two claims.   Although Verizon has stated they are moving for summary judgment as to all claims, Verizon failed to brief either of these claims in its Memorandum of Law in Support of Summary Judgment, despite the court having discussed them in its June 6, 2013 Ruling.   At oral argument, Verizon confirmed that it intended to move for summary judgment in full, and requested permission to brief the two remaining claims discussed above, which the court granted, giving Allen permission to respond once the claims were briefed.   See Order (Doc. No. 259).

protections for the leave . . . until a sufficient certification is provided."   29 C.F.R. §

825.313(b).   If an employee provides certification that is incomplete or insufficient, the

employer shall advise the employee to that effect, and "shall state in writing what

additional information is necessary to make the certification complete and sufficient."

29 C.F.R. § 825.305(c).   The employer "must provide the employee with seven

calendar days . . . to cure any such deficiency."   Id.   However, "if the employee never

produces the certification, the leave is not FMLA leave."   29 C.F.R. 825.313(b).

It is not contested that Allen did not submit a HCPC certificate in connection with

her FMLA request.   However, the record also indicates that Allen submitted medical

information from several different providers during that time period in connection with

her STD request, signed an authorization for her medical providers to provide

information to MetLife, provided MetLife with the names and contact information for her

treating physicians, and was in frequent communication with MetLife.   E.g., Admin.

Rec. at 325-357, 562.   Further, it is not clear from the record before the court whether

Allen had been notified, as required by the FMLA, that she specifically had to return the

HCPC certificate in order to be eligible for FMLA leave.   Allen's FMLA claim was

simultaneously generated with her request for STD.   The letter received by Allen from

MetLife regarding the medical information she was required to submit for her STD claim

did not inform her to submit the HCPC, but rather stated that "an FML claim has been

initiated along with your STD claim and MetLife will mail you a separate packet

concerning your FML claim."   Admin. Rec. at 606.

The only indication that Allen was told to return the HCPC certificate is MetLife's

internal record of a voicemail left by a case manager on March 12, 2010, which states

that "[Case Manager] let the [employee] know that she is eligible to receive FML

benefits and that she will be receiving an HCPC form in the mail for her FML claim that

she will need to have her [physician] fill out and send back to Met[Life] no later than

4/3/10."[8]   Admin. Rec. at 319.   However, if this packet was sent to Allen, it does not

appear to be part of the summary judgment record.   Further, the court notes that the

packet Allen received in connection with other FMLA requests specifically states that

the HCPC form must be completed by the health care provider and returned "if your

request for leave is due to your own serious health condition and you are not making a

claim, or you are ineligible for disability benefits under your Employer's disability plan.

If you are making a claim for disability benefits, the medical documentation submitted in

support of your disability claim will be reviewed for the purpose of determining your

leave request under the FMLA."   Admin. Rec. at 503 (emphasis added) (Nov. 16, 2010

letter); Admin. Rec. at 714 (Feb. 4, 2009 letter); Admin. Rec. at 829 (Sept. 14, 2009

letter); see also Verizon's Loc. R. 56(a)(1) Stmt. Exh. A-18 (Doc. No. 209-1 at 77) (Nov.

23, 2010 email from MetLife Disability to Allen stating that "you do not need to do

anything with [the HCPC] form unless we advise you otherwise").   If the written

instructions received by Allen were similar, this would have in fact advised her not to

return the HCPC, in direct contradiction to instructions she may have received orally,

because she was simultaneously making a disability claim.

-------

[8] This oral notice would, by itself, be insufficient.   See 29 C.F.R. § 825.300(c)(1) ("Employers shall provide written notice detailing the specific expectations and obligations of the employee and explaining any consequences of a failure to meet these obligations . . . Such specific notice must include, as appropriate . . . (ii) any requirements for the employee to furnish certification of a serious health condition . . . and the consequences of failing to do so."); 29 C.F.R. § 825.305(a) ("An employer must give notice of a requirement for certification each time a certification is required; such notice must be written notice whenever required by § 825.300(c).").

It is possible that MetLife determined that the medical information submitted by Allen in connection with her STD request was "incomplete or insufficient" to satisfy her request for FMLA, even if they did not require her to specifically submit the HCPC form. However, this is not clear from the denial letter, which simply states that her request for FMLA leave had been denied "because you failed to provide the required medical certification of a serious health condition, which was previously requested."   Verizon's Supplemental Memorandum of Law in Support of Its Motion for Summary Judgment (Doc. No. 260) ("Verizon's Supp. Mem."), Exh. B (Doc. No. 260-1).   However, unlike in the case where an employee simply fails to submit a certification, an employee who submits and insufficient certification must be told, in writing, what additional information is needed and must be provided with an opportunity to cure the deficiency.   See 29 C.F.R. § 825.305(c).   The court notes that one of Allen's primary care providers, APRN Hope, specifically requested that MetLife send her the FMLA paperwork on April 22, 2010, when the claim had already been denied.   Admin. Rec. at 537.

Construing all facts and inferences in the light most favorable to Allen, a reasonable jury could conclude that Verizon did not properly notify her that the HCPC certificate had to be submitted by a certain date in order to be eligible for FMLA, and thus interfered with rights provided to her by FMLA by denying her request on that basis.   Additionally, a jury could find that, if the medical information submitted by Allen within the fifteen day deadline was deficient, Allen should have been given the opportunity to cure that deficiency, and that as a result of the failure to do so, she was denied benefits to which she was entitled under FMLA.   Thus, there are genuine issues

of fact in dispute as to whether Allen was entitled to take leave under the FMLA[9] and whether Verizon denied her those benefits.

Verizon also argues that, even if there was an interference, there is no evidence that Allen suffered a tangible injury.   An employer who violates FMLA may be liable for damages in the amount of the injured employee's lost wages, salary, employment benefits, or other compensation – or, in the absence of such losses, actual monetary losses sustained by the employee as a direct result of the violation – as well as for the interest on that amount, and liquidated damages equal to the compensatory damages and interest.   29 U.S.C. § 2617(a)(1)(A).   Because the FMLA specifically lists the types of damages that an employer may be liable for, district courts in this circuit, as well as other circuits that have considered the issue, have determined that recovery for emotional distress, pain and suffering, and other intangible injuries is not available under the FMLA.   See Smith v. Westchester Cnty., 769 F. Supp. 2d 448, 469 n.23 (S.D.N.Y. 2011); Hamilton v. Niagara Frontier Transp. Auth., 2008 WL 4724324, at *6 (W.D.N.Y. Oct. 24, 2008); Vicioso v. Pisa Bros., 1998 WL 355415, at *4 (S.D.N.Y. July 1, 1998) (holding that the FMLA does not allow "recovery for pain and suffering, anxiety, humiliation, physical injury, [or] emotional distress"); see also Farrell v. Tri-County Metro. Transp. Dist. of Oregon, 530 F.3d 1023, 1025 (9th Cir.2008) (collecting cases from the 5th, 6th, 7th, 8th, 10th and 11th Circuit Courts of Appeals).

---

[9] The court notes that, several weeks after her FMLA denial, Allen's STD claim for the same time period was approved based on the additional medical information submitted in April 2010.   The standard for STD eligibility under Verizon's plan is nearly identical to the FMLA standard. Declaration of Cindy Broadwater, Exh. A: Managed Disability Summary Plan Description (Doc. No. 98-4) at 6 (For the purposes of STD, "an employee is considered disabled . . . when the employee is absent from work for at least 8 full consecutive calendar days . . . because of a medical condition for which there is objective medical evidence that the employee cannot perform the Essential Functions of his or her job at Verizon Wireless.")

Resolving all disputed facts and drawing all inferences in Allen's favor, if Verizon interfered with her rights under FMLA, a reasonable jury could find that Allen suffered tangible injury as a result of that interference.   It is not clear from the record whether Allen's prior instance of unapproved leave was taken into consideration when Verizon decided to terminate her employment in January 2011.   The record also indicates that in July 2010, following her unapproved leave, Allen received an "attendance final written warning" from Verizon.   Verizon's Loc. R. 56(a)(1) Stmt. Exh. A, Allen's Deposition Testimony (Doc. No. 209-1) at Tr. 69:19-23.   It is not clear from the record whether Allen would have received this sanction had her Spring 2010 leave been approved under FMLA.   The court notes that Verizon's "NEA HR Review" regarding Allen's termination references both the final written warning and her previous unapproved absences.[10]   Thus, Verizon's Motion for Summary Judgment is denied with regard to Allen's FMLA interference claim based on her February/March 2010 request for FMLA.

c.      Claim Based on Disclosure of Confidential Information

Finally, Verizon seeks summary judgment on Allen's claim of interference based on the disclosure of confidential information obtained during the FMLA process.

---

[10] In its Reply, Verizon argues that, because Allen has failed to authenticate this exhibit, the court cannot rely on it.   Verizon's Rep. at 3 n.4.   Verizon did not move to strike this exhibit, nor other exhibits which it claims are unauthenticated.   In response, Allen alleges that the document included as Exhibit 4 was provided to her in discovery.   If correct, then it may properly be considered. See Schaghticoke Tribal Nation v. Kempthorne, 587 F. Supp. 2d 389, 397 (D. Conn. 2008), aff'd, 587 F.3d 132 (2d Cir. 2009) (finding that emails sent to and from firm "have been properly authenticated to the extent that they were produced to Petitioner by [the firm] itself during discovery"); John Paul Mitchell Sys. v. Quality King Distribs., Inc., 106 F.Supp.2d 462, 472 (S.D.N.Y.2000) (holding that the act of production itself implicitly authenticates documents).   Thus, for the purpose of deciding this Motion, and in reliance on Allen's representation to the court, the court will presume that this exhibit could be properly authenticated at trial. See Lenoble v. Best Temps, Inc., 352 F. Supp. 2d 237, 243 (D. Conn. 2005). The court further notes that, while illustrative, the exhibit is not itself dispositive in its determination to deny summary judgment on this count.

Pursuant to 29 C.F.R. § 825.500(g), "records and documents relating to certifications, recertifications or medical histories of employees or employees' family members, created for purposes of FMLA, shall be maintained as confidential medical records in separate files/records from the usual personnel files."   While there is no clear authority as to whether the FMLA creates a private right of action based on this requirement, at least one district court in this Circuit has found that such a right exists in the context of a motion to dismiss.   See Mahran v. Benderson Development Company, LLC, 2011 WL 1467368 (W.D.N.Y. April 18, 2011).

However, even if a private right of action for interference based on the FMLA's record-keeping requirements exists, summary judgment is appropriate in this case. Unlike in Mahran, there is no allegation that any confidential information was disclosed to Allen's coworkers or to the public, or that any disclosure was intentional.   Further, there is no evidence that the records created for the purpose of FMLA were not maintained separately from Allen's "usual personnel files."   Rather, Allen's claim is that individuals who properly had access to her confidential medical information should not have also had access to medical information she had submitted about Whitman. Finally, there is no evidence that Allen suffered any injury cognizable under the FMLA as a result of the disclosure, as discussed supra at 24.   Thus, summary judgment for Verizon is appropriate with regard to Allen's FMLA interference claim based on the disclosure of confidential information.

3.   FMLA Retaliation

Allen also alleges that she was terminated in retaliation for seeking and taking FMLA leave.   Sixth Am. Compl. ¶ 267.   To make out a prima facie case of retaliation,

Allen must establish that 1) she exercised rights protected under the FMLA; 2) she was qualified for her position; 3) she suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent.   Potenza v. City of New York, 365 F.3d 165, 168 (2d Cir. 2004). "FMLA retaliation claims are evaluated within the McDonnell Douglas burden-shifting framework."   Mathew v. N. Shore-Long Island Jewish Health Sys., Inc., 582 F. App'x 70, 70-71 (2d Cir. 2014) (summary order) (citing Potenza v. City of New York, 365 F.3d 165, 168 (2d Cir. 2004)).

Verizon argues that Allen cannot establish the first element of her prima facie case – that she exercised her rights under the FMLA – because she was not eligible for those rights at the time of her termination, as discussed supra.   However, Allen had previously been eligible for, and exercised, FMLA rights and argues that she was terminated in retaliation for doing so.   Allen's Opp. re: Verizon at 28.   Thus, construing all facts in her favor as the non-moving party, she has established the first element of the prima facie case.

However, as discussed in the context of Allen's ADA claim, supra at 16-17, even if she can make out a prima facie case, Allen has not provided any evidence that Verizon's justification for firing her was pretextual.   Allen argues that the "NEA HR Admin Review" form from Verizon regarding her termination provides evidence of pretext, in that under "other relevant info" it lists "out in 2010 – CFML 02/08 – 02/19/10, also out on STD with no FML from 02/24-06/18."   Allen's Opp., Exh. 4 (Doc. No. 229-9)

at 1.   The court concludes that this statement alone is not evidence of pretext.[11]

There is no indication that Allen's use of CFML in February 2010 was a reason for her

termination; rather, the same form states that the "triggering event" was the <u>denied</u>

FMLA and STD claims in November 2010, after which Allen's continued absence was

considered unauthorized and unexcused.   As discussed <u>supra</u> at 16-17, the record

only supports that Allen was terminated because she neither provided medical

documentation to substantiate her absences nor returned to work after her FMLA claim

was denied, despite being advised that her failure to do so would result in termination.

There are no facts in dispute which, if decided in Allen's favor, would permit a

rational factfinder to conclude that Verizon's rationale for termination was pretextual.

Thus, summary judgment is granted for Verizon with regards to Allen's FMLA retaliation

claim.

### 4.    ERISA Interference

"Section 510 of ERISA prohibits terminations 'for the purpose of interfering with

the attainment of any right to which such participant may become entitled under [an

employee benefit plan].'"   <u>Hayes v. Compass Group USA, Inc.</u>, 343 F. Supp. 2d 112,

121 (D. Conn. 2004) (citing 29 U.S.C.A. § 1140).   "Stated differently, a § 510 claim

involves three elements: (1) prohibited employer conduct; (2) taken for the purpose of

interfering; (3) with the attainment of any right to which the employee may become

entitled."   <u>Id.</u> (citing <u>Romero v. SmithKline Beecham</u>, 309 F.3d 113, 119 (3rd

Cir.2002)).   In order to prevail on this claim, Allen must show that interfering with her

rights under ERISA was a motivating factor behind her termination, and not merely a

---

[11]   <u>See</u> note 10 discussion of Verizon's argument that this exhibit is inadmissible.

consequence of being terminated.   Id.   In assessing whether interference with Allen's rights under ERISA was a motivating factor in her termination, the court applies the McDonnell Douglas standard.   Id. (citing Dister v. Continental Group, Inc., 859 F.2d 1108, 1112 (2d Cir. 1988).

As discussed in relation to Allen's ADA claim, supra 16-17, even if Allen has made out a prima facie case for interference, there is nothing in the record to support a finding that Verizon's stated reason for her termination was pretext.   While Allen's appeal was pending at the time of her termination, there is no evidence to support the conclusion that Verizon terminated Allen in order to interfere with benefits to which she might be entitled under that appeal.[12]   Thus, Verizon's motion for summary judgment is granted as to Allen's ERISA interference claim.

### 5.   ERISA Retaliation

"ERISA [section] 510 [also] provides that it is illegal to 'discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan.'" Giordano v. Thompson, 564 F.3d 163, 169 (2d Cir. 2009) (citing 29 U.S.C. § 1140).   To make out a prima facie case of ERISA retaliation, Allen must allege that: (1) she was engaged in protected activity; (2) Verizon was aware of that activity; (3) she suffered an adverse employment decision; and (4) there was a causal connection between the protected activity and the adverse employment action.   Id.   Moreover, she must prove that Verizon had the specific intent to retaliate against her, which is determined under

---

[12]   The court also notes that Allen's termination did not affect the status of her appeal, which remained pending. See Pl.'s Loc. R. 56(a)(2) Stmt. Re: Verizon ¶¶ 78, 79.

the McDonnell Douglas burden-shifting framework.   Id.

Allen's termination occurred in close proximity to the time of her engagement in protected activity; namely, her appeal of the STD denial submitted on January 4, 2011. Temporal proximity can support an inference of causal connection if the retaliatory action and protected activity were "very close" in time.   See Perry v. NYSARC, Inc., 424 F. Appx. 23, 26 (2d Cir. 2011) (summary order).   However, even assuming Allen can make out her prima facie case, she has not established a genuine issue of material fact concerning whether Verizon's termination of Allen was pretextual, as discussed supra 16-17, or that Verizon had the specific intent to retaliate against her.   Thus, Verizon's Motion for Summary Judgment is granted as to Allen's claim for ERISA retaliation.

B.   MetLife's Motion for Summary Judgment: Federal Claim

1.   ERISA Wrongful Denial of Benefits

Allen argues that MetLife wrongfully denied her benefits under ERISA when it denied her November 23, 2010 STD request.   Under section 502(a)(1)(B) of ERISA, a beneficiary may bring a civil action to challenge a denial of benefits.   29 U.S.C. § 1132(a)(1)(B).   The court reviews a plan administrator's decision de novo unless the Plan "gives the administrator or fiduciary discretionary authority" to assess a participant's eligibility.   Thurber v. Aetna Life Ins. Co., 712 F.3d 654, 658 (2d Cir. 2013) (quoting Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989)).   If the Plan does reserve discretion, "the denial is subject to arbitrary and capricious review."   Id.

MetLife and Allen agree that it had discretionary authority under the Plan; thus the appropriate standard of review is whether its denial was arbitrary and capricious.[13] MetLife's Memorandum of Law in Support of its Motion for Summary Judgment (Doc. No. 215) ("MetLife's Memo.") at 21; Allen's Memorandum of Law in Support of its Opposition of MetLife's Motion for Summary Judgment (Doc. No. 229-3) ("Allen's Opp. re: MetLife") at 17.

"A decision is arbitrary and capricious only if it is found to be without reason, unsupported by substantial evidence or erroneous as a matter of law." Miles v. Principal Life Ins. Co., 720 F.3d 472, 486 (2d Cir. 2013) (citing Pagan v. NYNEX Pension Plan, 52 F.3d 438, 442 (2d Cir.1995) (internal quotations omitted). Allen argues that MetLife's denial was arbitrary and capricious because: 1) MetLife failed to consider subjective evidence of her disability; 2) during the appeal of her November 2010 claim denial, MetLife inadvertently used Whitman's medical certificate in assessing Allen's claim; 3) MetLife used the wrong job description to evaluate Allen; and 4) MetLife failed to advise Allen of the objective evidence they required. Allen's Opp. re: MetLife at 17-18.

Subjective complaints of disabling conditions are an "important factor to be considered in determining disability." Miles v. Principal Life Ins. Co., 720 F.3d 472 (2d Cir. 2013) (citing Connors v. Conn. Gen. Life Ins. Co., 272 F.3d 172, 136 (2d Cir. 2001).

---

[13] Allen also confirmed this at oral argument. Allen's Opposition also appears to argue that MetLife had a "structure conflict of interest," in which case the court could "dial back deference." Miles, 720 F.3d at 485; see Hobson, 574 F.3d at 82-83. However, Allen has provided no evidence that MetLife had a "structural conflict of interest," which exists when a plan administrator has both authority to determine eligibility for benefits and the obligation to pay benefits when due. See id. There is no evidence that MetLife paid benefits under the STD plan; rather, the plan summary indicates that STD benefits were paid through the Verizon Wireless payroll. Plan Description at 9.

"It is arbitrary and capricious to disregard evidence simply because it is subjective."   Id.

A reviewing court "is obliged to determine whether a plan administrator has given

sufficient attention to [the claimant's] subjective complaints . . . before determining that

they were not supported by objective evidence."   Id. (citing Thurber v. Aetna Life Ins.

Co., 712 F.3d 654, 660 (2d Cir. 2013).   However, a plan administrator may require a

claimant to produce objective medical evidence of disability in a claim for disability

benefits.   See Hobson v. Metropolitan Life Ins. Co., 574 F.3d 75, 88 (2d Cir. 2009).

　　　　Under the terms of Verizon's Plan in order to receive STD, Allen was required to

provide "objective medical evidence" that she could not "perform the Essential

Functions of . . . her job at Verizon Wireless."   Declaration of Cindy Broadwater, Exh.

A: Managed Disability Summary Plan Description (Doc. No. 98-4) ("Plan Description") at

6.   When MetLife made its initial determination denying Allen's November 23, 2010

STD request, its stated reason for doing so was that she had failed to submit the

required objective medical documentation by the December 10, 2010 deadline.

Admin. Rec. at 478-79.   While Allen provides a sworn affidavit that she faxed notes

from her visit to Dr. Saidon, the endodontist, on or around December 6, 2010, Allen

Opp. re: MetLife, Affidavit of Queen Allen (Doc. No. 229-7) ¶ 5, there is no evidence

that MetLife received this or that it was part of MetLife's file until it was received by fax

on February 28, 2011.   Admin. Rec. 296, 630-31.

　　　　Under these circumstances, MetLife "was not required to accept [plaintiff's]

subjective complaints in the absence of objective evidence supporting disability."

Ianiello v. Hartford Life and Acc. Ins. Co., 2012 WL 314872 at *3 (E.D.N.Y. 2012)

(internal citation and quotations omitted).   Under the terms of the Plan, Allen had the

burden of proving her disability, and it was reasonable for MetLife to require objective evidence in support of her claimed limitations.   Id.    Cases in this Circuit have distinguished between requiring objective evidence of pain, which in some cases may be unreasonable, and requiring objective evidence that the alleged condition results in a functional impairment.   Schnur v. CTC Commc'ns Corp. Grp. Disability Plan, 2010 WL 1253481, at *14 (S.D.N.Y. Mar. 29, 2010) aff'd, 413 F. App'x 377 (2d Cir. 2011); Fortune v. Grp. Long Term Disability Plan for Employees of Keyspan Corp., 637 F. Supp. 2d 132, 143 (E.D.N.Y. 2009) aff'd, 391 F. App'x 74 (2d Cir. 2010); Fitzpatrick v. Bayer Corp., 2008 WL 169318, at *11 (S.D.N.Y. Jan. 17, 2008); see also Miles, 720 F. 3d at 489 (citing Cusson v. Liberty Life Assurance Co. of Boston, 592 F.3d 215, 227 (1st Cir. 2010) for this proposition).

Further, MetLife did not disregard Allen's subjective complaints.   In the letter from Karen Rotundo denying Allen's appeal, Ms. Rotundo noted Allen's initial description of her disability as "mouth pain," as well as noting that in March 2011, "you stated that your issue had not resolved and you were still in pain . . . you noted this had been very stressful."   Admin. Rec. at 446.   While Ms. Rotundo acknowledged that Allen had received treatment, and "recognize[d] that [Allen] may have had some difficulty," she found that the information available "lacked the objective evidence sufficient to document a condition or symptoms that were of a level of severity that would be consistent with functional impairment and an inability to perform your job."   Id. 447.   Thus, MetLife gave sufficient attention to Allen's subjective complaints before determining that they were not supported by objective evidence of functional limitations, and did not abuse its discretion in concluding either that Allen's subjective complaints

alone did not warrant finding her eligible for STD benefits, or that the objective evidence did not support such a finding.   Thurber v. Aetna Life Ins. Co., 712 F.3d 654, 660 (2d Cir. 2013).

Allen also argues that MetLife's error in sending Whitman's HCPC certificate to the independent peer reviewers as part of Allen's file rendered its denial arbitrary and capricious, because the IPC erroneously relied on Whitman's medical record in determining that Allen's claims of functional limitation were not supported.   Allen's Opp: re: MetLife at 15, 17.

It is clear that the mental health specialist, Dr. Packer, considered the report from Whitman's APRN as if it was part of Allen's medical record, and erroneously treated the descriptions of Whitman's symptoms and diagnoses as if they were Allen's. Admin. Rec. 453-58.   However, even given this error, the court cannot determine that MetLife's denial decision was unsupported.   While the inconsistencies between the report concerning Whitman and the rest of Allen's medical file were a source of confusion (and potentially concern) to Dr. Packer, the most recent report was from Allen's own APRN, Nurse Hope.   Id. at 465.   APRN Hope's report was also the only report reviewed by Dr. Packer that directly addressed Allen's psychiatric symptoms during the time period in question, Nov. 15, 2010 through January 14, 2011.   Id. at 453.   The report stated that it was not necessary for Allen to leave her position for health reasons, but that "her symptoms made it difficult to be as consistent with attendance as she needed to be," and that Allen was able to work full time as of January 15, 2011.   Id. at 465.   It further stated that Allen needed a "less pressured work environment than constant customer phone service" and that "the job (constant

phone work/customer service) was stressful for her – not a great match."   Id.   APRN

Hope also left a voicemail for Dr. Packer detailing her treatment of Allen and Allen's

condition.   Id. at 454-5.   Dr. Packer reviewed both the report and the voicemail and

found that they did not support a finding of functional limitations based solely on Allen's

psychiatric symptoms.[14]   Id. at 457.   Other than this report, Allen did not provide any

additional medical evidence related to her mental health during the period of her

absence.   Prior to review by the IPCs, Allen's file was also reviewed by a MetLife

claims specialist, APRN Karen Rotundo, who similarly determined that Allen's disability

claim was not supported by the evidence.   Admin. Rec. at 300-01.

Allen also alleges that the job description utilized by MetLife was incorrect and

did not take into account that she was required to spend 90% of the day talking on the

phone.   Allen's Opp. re: MetLife at 15-17.   This argument is without merit.   While the

job description provided by Verizon and used by MetLife does not reference a particular

percentage of time, it included the requirements to "express her thoughts verbally," to

"interact and respond to others while handling conflict or difficult people," and to

"interact and respond to others in a normal social/work environment" which would

include verbal communications on the telephone.   Admin. Rec. 287.   Further, even

assuming that Allen's job contained such a requirement, it would not render MetLife's

determination that the medical documentation did not support a finding of functional

---

[14] Dr. Packer did not opine as to whether there was sufficient documentation of medical conditions (other than psychiatric symptoms) that could impact functional limitations.   Admin. Rec. at 457. The other IPC, Dr. Thomas, concluded that the medical information submitted contained "no documentation for functional limitations from either the perspective of general dentist or the endodontist" and that she was "not functionally impaired" between November 15, 2010 and January 14, 2011.   Id. at 451.

impairment arbitrary and capricious.[15]

Additionally, Allen's argument that she was not notified that she had to submit objective medical evidence is not supported by the record.   In addition to the inclusion of this requirement in the Plan Summary, Verizon's Mot. for Summ. Judg. Exh. 19 (Doc. No. 209-1 at 78) at 491, Allen received notification in the initial letter dated November 23, 2010, which informed her that "it is your responsibility to ensure that your health care provider(s) submits medical documentation in support of your Short Term Disability claim to MetLife by 12/10/2010.   This information should clarify and or include medical records, test results, and/or treatment notes."   Id. at 484.   When Allen's initial STD claim was denied, she received a letter stating that the reason for denial was a failure to submit the necessary objective medical evidence and other documentation, and informing her that, if she wished to appeal, she should "submit the previously requested information as well as any additional comments, documents, records, or other information relating to your claim."   Verizon's Mot. for Summ. Judg. Exh. 22 (Doc. No. 209-1 at 95).   Further, she was repeatedly informed throughout the appeal process that she needed to provide medical information.   Thus, the only evidence in the record supports only one conclusion: Allen was told about the requirement to submit objective medical evidence.

Finally, Allen appears to argue that MetLife was required to conduct a independent medical examination (IME) before denying her appeal.   See Allen's Opp.

---

[15]   The court also notes that in her IPC review, Dr. Packer cited APRN Hope's descriptions of Allen's job as "constant customer phone service" and "constant phone work" prior to arriving at her conclusion that there was insufficient documentation that psychiatric problems alone were responsible for Allen's inability to work during the time in question. Admin Rec. at 453-58.

re: MetLife at 16.   The court disagrees.   "Where the ERISA plan administrator retains the discretion to interpret the terms of its plan, the administrator may elect not to conduct an IME, particularly where the claimant's medical evidence on its face fails to establish that she is disabled."   Hobson v. Metro. Life Ins. Co., 574 F.3d at 91. MetLife's decision not to conduct an IME was within its discretion, and thus did not render its decision arbitrary and capricious.

    C.    <u>State Law Claims</u>

    1.    Breach of Contract

Both Allen and Whitman bring claims for breach of contract against Verizon and MetLife based on the disclosure of Whitman's medical certificate to the IPCs.   They argue that they are third-party beneficiaries under the Administrative Services Agreement between Verizon and MetLife, that Verizon and MetLife assumed a direct obligation to protect their confidential information under the ASA, and that that obligation was breached.   In support, they point to section 12 of the ASA, entitled "Privacy of Medical Records."   Verizon's Loc. R. 56(a)(1) Stmt. Exh. A-7 (Doc. No. 209-2 at 74) ("Administrative Services Agreement").   Both Verizon and MetLife have moved for summary judgment on these claims.

Under Connecticut law, "a third party beneficiary may enforce a contractual obligation without being in privity with the actual parties to the contract."   Reyes v. Nautilus Ins. Co., 2012 WL 1004302, at *4 (Conn. Sup. Ct. Mar. 6, 2012) (quoting Rapaport & Benedict, P.C. v. Stamford, 39 Conn. App. 492, 497 (1995)).   "[T]he ultimate test to be applied [in determining whether a person has a right of action as a third party beneficiary] is whether the intent of the parties to the contract was that the

promisor should assume a direct obligation to the third party [beneficiary]."   Dow & Condon, Inc. v. Brookfield Dev. Corp., 266 Conn. 572, 580-81 (2003).   The court determines that intent "from the terms of the contract read in the light of the circumstances attending its making, including the motives and purposes of the parties." Id.   While "it is not in all instances necessary that there be express language in the contract creating a direct obligation to the claimed third party beneficiary," the Connecticut Supreme Court has emphasized that "the only way a contract could create a direct obligation between a promisor and a third party beneficiary would have to be, under our rule, because the parties to the contract so intended."   Id. (citing Knapp v. New Haven Road Construction Co., 150 Conn. 321, 325 (1963)).

Allen and Whitman point to section 12 of the ASA, "Privacy of Medical Records." Pursuant to section 12.1, both Verizon and MetLife agree that health data obtained during the performance of Metlife's duties and obligations under the Agreement "shall be kept private and confidential and shall not be released to parties other than the parties hereto or their contractors . . . ."   Verizon's Loc. R. 56(a)(1) Stmt. Exh. A-7, Administrative Services Agreement § 12.1.   Section 12.2 further provides that Verizon "will undertake those efforts reasonably deemed necessary by Supplier to protect the information used in connection with [MetLife's] administration, evaluation, or management" of Verizon's disability plans or FMLA compliance obligations.   Id. § 12.2.

Verizon and MetLife argue that these provisions alone, read in the context of the agreement as a whole, are insufficient evidence that they intended to create direct obligations to third parties.   The court agrees.   The ASA also contains a section on indemnification, Section 21, that explicitly states that "[n]othing in this Section is

intended, nor shall it be interpreted, to give any third party, including but not limited to Participants, any right, claim or cause of action against the Indemnified Party or Supplier."   This only directly applies to limit any claims arising from section 21. However, section 28, "Limitation of Liability," also states that "in no event shall either party be liable to . . . any third party, for any indirect, incidental, special, consequential, punitive damages . . ., or lost wages for any claim or demand of any nature or kind, arising out of or in connection with this agreement or the performance or breach thereof."   While certain sections are excluded from the limitation in section 28, section 12 is not.[16]   Allen and Whitman have provided no other evidence that the intent of the parties was to assume a direct obligation to them.

     2.     Intentional Infliction of Emotional Distress

Whitman's claims of intentional infliction of emotional distress against Verizon and MetLife are based on two occurrences related to her medical certificate: first, that in March 2010, MetLife contacted APRN Spiegel to request information regarding Allen, even though APRN Spiegel actually treated Whitman; second, that Whitman's medical certificate was provided by MetLife to the two peer reviewers during Allen's STD appeal in Spring 2011, as part of Allen's medical file.

In order to prevail on her claim of intentional infliction of emotional distress (IIED) under Connecticut law, Whitman must prove: "(1) that the actor intended to inflict

_____

[16] In her Opposition, Allen also points to the "Non-Disclosure" provision included as "Exhibit G" pursuant to section 11, entitled "Confidential Information."   Allen's Opp. re: MetLife at 9.   Unlike section 12, section 11 is clearly excluded from the section 28 limitation of liability.   However, in the court's view, Exhibit G clearly relates only to the confidential information belonging to either Verizon or MetLife, such as proprietory information or trade secrets, and it does not relate to medical information pertaining to a third party.   Thus, neither section 11 nor Exhibit G provides a third party right of action to Allen or Whitman.

emotional distress; or that he knew or should have known that emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe."   Peytan v. Ellis, 200 Conn. 243, 253 (1986).   Whether a defendant's conduct is "extreme and outrageous" is initially a question for the court to determine.   Perez-Dickson v. City of Bridgeport, 304 Conn. 483, 527 (2012).

Given this standard, summary judgment is appropriate for both Verizon and MetLife.   There are no facts in dispute from which a reasonable jury could conclude that the conduct by either party was "extreme and outrageous."   While learning that her medical certificate had been mistakenly reviewed by the two peer reviewers may certainly have been upsetting for Whitman, the court cannot say that it was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."   Id.   Even given the sensitivity of one's medical information, the type of disclosure at issue here – which was limited and took place within a process that was itself kept confidential – does not rise to that level.   Similarly, MetLife inadvertently faxing a form with questions about Allen to Whitman's healthcare provider does not rise to the level of extreme and outrageous, nor would Verizon or MetLife have reason to know that it would inflict emotional distress on Whitman.   Thus, summary judgment is granted as to Whitman's IIED claims.

3.      Negligent Infliction of Emotional Distress

Whitman also asserted claims of negligent infliction of emotional distress (NIED) against both Verizon and MetLife based on the same two incidents that underlie her IIED claims.   Allen also claims NIED against MetLife based on it having contacted APRN Spiegel during its review of her Spring 2010 STD claim.[17]

In order to claim NIED under Connecticut law, a plaintiff must prove that: "(1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress." Vega v. Sacred Heart Univ., Inc., 871 F.Supp.2d 81, 85 (D. Conn. 2012) (citing Carrol v. Allstate Ins. Co., 262 Conn. 433, 444 (2003)).   The foreseeability requirement in an NIED claim is "more specific" than the standard negligence requirement that an actor should have foreseen his conduct was likely to cause harm.   Olson v. Bristol-Burlington Health Dist., 87 Conn. App. 1, 5 (2005) (citing Scanlon v. Connecticut Light & Power Co., 258 Conn. 436, 446-47, 782 A.2d 87 (2001).   Rather, in order to claim NIED, a plaintiff must show "that the actor should have foreseen that [his or] her behavior would likely cause harm of a specific nature, i.e., emotional distress likely to lead to illness or bodily harm."   Id.

Even viewed in the light most favorable to Whitman, her evidence does not support an inference that MetLife should have foreseen that including her certificates in

_____

[17]  Allen's NIED claim against MetLife was previously dismissed, MTD Ruling at 30-31; however, Allen was given leave to replead and did so at Count Five of the Sixth Amended Complaint. Sixth Amd. Compl. at ¶¶ 145-164.

Allen's appeal file would "likely cause . . . emotional distress likely to lead to illness or bodily harm."   The court recognizes the sensitivity of one's medical information, and there are certainly circumstances in which the disclosure of medical records would foreseeably cause emotional distress.   However, there is no evidence that Whitman's certificate was disclosed to anyone other than the two IPCs, during what was itself a confidential process.   Thus, to the extent that disclosure occurred, it was limited and contained.   Further, Whitman's claim appears in part based on her allegation that Allen was fired because of Whitman's certification being wrongfully attributed to her.   As discussed in more detail below, infra at 43, there is no evidence in the record to support this allegation, and the disclosure of Whitman's certificate to the IPCs took place several months after Allen's termination.   Further, contrary to Whitman's allegations, there is no evidence before the court that Whitman's certificate was disclosed to Verizon in connection with Allen's termination.

Similarly, even assuming that Whitman suffered emotional distress likely to lead to illness or bodily harm as a result of MetLife faxing a form request for Allen's claim to Whitman's treating provider (APRN Spiegel), the evidence does not support an inference that MetLife should have foreseen such distress.   The totality of MetLife's actions with regard to this event involved MetLife faxing a form with questions and Allen's claim number to APRN Spiegel, who then called back and informed MetLife that Allen was not her patient.   Admin. Rec. at 339, 590-92.   Whitman has not produced evidence from which a jury could reasonably conclude that MetLife should have foreseen that these actions would cause emotional distress likely to result in illness or

bodily harm to Whitman.   Thus, summary judgment for MetLife is appropriate on Whitman's NIED claim.

To the extent that Whitman's NIED claim against Verizon is similarly based on MetLife's disclosure, summary judgment is appropriate for the reasons set forth above. Whitman further argues that Verizon used her certificate in connection with its decision to terminate Allen, that this caused her emotional distress, and that such distress was foreseeable.   However, there is no evidence in the record to support Whitman's allegation.   While it is undisputed that Whitman's certificate was erroneously used by MetLife in connection with Allen's STD appeal in Spring 2011, Allen's termination took place several months prior to that occurrence.   Allen's STD appeal, even if granted, would not have affected her termination.   There is no evidence in the record to support Whitman's allegation that "her Certification was used by Verizon as a factor in Allen's termination."   Thus, summary judgment is appropriate for Verizon on Whitman's NIED claim.

Finally, Allen also claims NIED against MetLife based on the form faxed to APRN Spiegel in connection with her STD request, which she argues revealed her personal health information.   MetLife maintains that the form was "blank" and did not reveal any of Allen's personal information.   The relevant form included Allen's name and claim number.   Admin. Rec. at 590.   It did not include any other information specific to Allen, but contained a number of questions asking about her symptoms, "mental health condition," and treatment.   Id. at 589.

Because the action forming the basis of Allen's NIED claim took place during the

43

processing of her STD benefits request, her claim is preempted by ERISA.[18]   See Rovira v. AT&T, 760 F.Supp. 376, 379 (S.D.N.Y. 1991) (recognizing that when a beneficiary claims relief for injuries which arise out of the administration of an ERISA benefit plan, the state claims "relate to" the plans and are preempted); see also Darcangelo v. Verizon Communic., 292 F.3d 181, 188 (4th Cir. 2002) (finding, in relation to claim that defendant had solicited plaintiff's private medical information, that "[i]f [defendant] obtained [plaintiff]'s medical information in the course of processing a benefits claim or in the course of performing any of its administrative duties under the plan, these claims would be 'related to' the ERISA plan under [section] 514 and would therefore be preempted.").

However, even if Allen's claim were not preempted, and assuming that Allen suffered an injury sufficient to support her claim, the evidence is insufficient to support an inference that her distress was foreseeable.   As discussed previously, supra at 43, the form did not contain any of her personal health information.   Further, to the extent that it disclosed that she may have suffered from an unidentified mental health condition, the disclosure was not made broadly; rather, it was disclosed only to another health care provider in the context of a confidential review.   While the court recognizes the sensitivity of medical information, MetLife's conduct in this instance does not rise to the level of creating an unreasonable risk, which it should have foreseen, that would

---

[18] "The determination of whether a state law is preempted by ERISA requires two prongs of analysis."   Case v. Hospital of St. Raphael, 38 F.Supp.2d 207, 208 (D. Conn. 1999).   First, a state law claim is preempted when it "refers to ERISA plans in the sense that it acts solely upon such plans or depends upon the existence of an ERISA plan as an essential part of its operation."   Id.   Second, even if the state law does not refer to ERISA, it is preempted if it "has a clear connection with a plan by mandating employee benefit structures and administration or by providing alternative enforcement mechanisms."   Id.

likely cause emotional distress likely to lead to illness or bodily harm.

       4.      Invasion of Privacy

Finally, Whitman alleges that MetLife invaded her privacy by an unreasonable intrusion upon her seclusion caused by the release of her HCPC form to the peer reviewers.   Under Connecticut law, the claim of unreasonable intrusion upon the seclusion of another "consists solely of an intentional interference with [a person's] interest in solitude or seclusion, either as to his person or as to his private affairs or concerns, of a kind that would be highly offensive to a reasonable man." Bremmer-McLain v. City of New London, 2012 WL 2477921, at *14 (Conn. Super. June 1, 2012).   While it is not in dispute that MetLife did release Whitman's HCPC to the peer reviewers, there is no evidence in the record that would support a finding that MetLife's actions constituted an "intentional interference" with Whitman's interest in seclusion.   Thus, summary judgment is granted as to this claim.

## IV.    MOTION FOR SANCTIONS

Defendants have also filed a Motion for Sanctions, which remains pending before the court.   Motion for Sanctions (Doc. No. 204).   The first, third, and fourth sanctions sought by defendants relate entirely to Whitman's claims.   Motion for Sanctions at 6.   As the court has granted summary judgment as to all of these claims, the relief sought is moot.   The second sanction sought by defendants is an order directing plaintiffs not to engage in conduct considered to be the "unauthorized practice of law."   Id.   The basis for this request is defendant's claim that Allen has allegedly assisted Whitman with her claims.   Id. at 4.   Because the remaining claim will go

45

forward as to Allen only, this relief is also moot.   Thus, defendants' Motion for

Sanctions is terminated as moot.

## IV.     CONCLUSION

For the foregoing reasons, Verizon's Motion for Summary Judgment (Doc. No.

207) is **GRANTED** in part and **DENIED** in part.   MetLife's Motion for Summary

Judgment (Doc. No. 212) is **GRANTED**.   The remaining claim – Allen's claim against

Verizon for FMLA interference based on her February/March 2010 FMLA request – will

proceed to trial.

**SO ORDERED.**

Dated this 23rd day of June, 2015 at New Haven, Connecticut.


  /s/ Janet C. Hall_____
Janet C. Hall
United States District Judge